IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| STATE OF DELAWARE, | § | |
| | § | No. 64, 2015 |
| Plaintiff-Below, | § | |
| Appellant, | § | Court Below: Superior Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | |
| JERMAINE WRIGHT, | § | |
| | § | ID No. 91004136 |
| Defendant-Below, | § | |
| Appellee. | § | |

Submitted: October 28, 2015
Decided: January 11, 2016

Before **STRINE**, Chief Justice; **HOLLAND**, **VALIHURA**, **VAUGHN**,
and **SEITZ**, Justices, constituting the Court *en Banc*.

Upon appeal from the Superior Court. **REVERSED AND REMANDED**.

Elizabeth R. McFarlan, Esquire *(argued)*, Chief of Appeals, Maria T. Knoll, Esquire,
Deputy Attorney General, Department of Justice, Wilmington, Delaware, for
Appellant.

Eugene J. Maurer, Jr., Esquire, Allison S. Mielke, Esquire *(argued)*, Wilmington,
Delaware, for Appellee.

**VAUGHN**, Justice:

In 1992 Jermaine Wright was convicted of Murder in the First Degree, Robbery in the First Degree, and related weapons offenses for his involvement in what was known as the Hi-Way Inn murder/robbery. The Superior Court imposed the death penalty for his conviction of Murder in the First Degree. Prior to trial, Wright moved to suppress a statement he had given to police. He alleged that his waiver of *Miranda* rights was invalid and his statement was involuntary because he was high on heroin at the time. On October 9, 1991, the Superior Court, after a hearing, found that Wright "had sufficient capacity to know what he was saying and to have voluntarily intended to say it."[1] The Superior Court further found that Wright had been given the *Miranda* rights three times, by three different police officers, and that the State had "met its burden of proof by a preponderance of the evidence that the Defendant's waiver of his *Miranda* rights was voluntary, knowing and intelligent, and that his confession was voluntarily made."[2] Wright then filed a second pretrial motion to suppress his confession on other grounds. In its opinion denying that motion, dated August 6, 1992, the Superior Court again found that Wright had been given his *Miranda* rights three times.[3] The confession was admitted into evidence at trial.

---

[1] *State v. Wright*, 1991 WL 11766247, at *7-8 (Del. Super. Oct. 30, 1991) (quoting *Howard v. State*, 458 A.2d 1180, 1183 (Del. 1983)) (internal quotation marks omitted).
[2] *Id.* at *9.
[3] *State v. Wright*, 1992 WL 207255, at *3 (Del. Super. Aug. 6, 1992).

On direct appeal, Wright's convictions and sentences were affirmed.[4] Between then and 2009, Wright filed four motions for postconviction relief. In the second postconviction proceeding, the Superior Court again rejected Wright's contention that his waiver of *Miranda* rights was not valid.[5] In 2014, in the fourth postconviction proceeding, this Court reversed Wright's convictions on the ground that the State violated his rights under *Brady v. Maryland*.[6] The case was remanded to the Superior Court for a new trial.[7]

By the time the fourth motion for postconviction relief was filed, the original trial judge had retired and the case had been assigned to her successor. In the new trial proceedings, the successor judge granted a motion to suppress Wright's confession on the ground that the *Miranda* rights he was given were inadequate, and that his waiver was, therefore, not valid.[8] This ruling is now before us on appeal by the State under 10 *Del. C.* § 9902(b).[9]

For the reasons which follow, we have concluded that the original Superior Court judge's determination that Wright's waiver of his *Miranda* rights was voluntary,

---

[4] *Wright v. State*, 633 A.2d 329, 330-31 (Del. 1993).
[5] *State v. Wright*, 1998 WL 734771, at *5-6 (Del. Super. Sept. 28, 1998).
[6] 373 U.S. 83, 83 (1963).
[7] *Wright v. State*, 91 A.3d 972, 977 (Del. 2014).
[8] *State v. Wright*, 2015 WL 475847, at *19-29 (Del. Super. Feb. 2, 2015).
[9] 10 *Del. C.* § 9902(b) ("When any order is entered before trial in any court suppressing or excluding substantial and material evidence, the court, upon certification by the Attorney General that the evidence is essential to the prosecution of the case, shall dismiss the . . . indictment . . . .").

knowing, and intelligent necessarily included an implied determination that the warnings were adequately given. Those determinations are the law of the case. For this reason, the successor judge erred in reviewing the admissibility of Wright's confession.

The State also appeals the successor judge's denial of a motion that he recuse himself.[10] At oral argument, the State candidly conceded that this Court does not have jurisdiction under 10 *Del. C.* § 9902 to review that order. Therefore, we do not address the Superior Court's ruling on recusal or express any opinion on recusal. At the conclusion of this opinion, however, we do address reassignment of the case.

## I. FACTS AND PROCEDURAL HISTORY

The facts as they appear in this Court's 1993 opinion on direct appeal, with footnotes omitted, are as follows:

> The essential facts underlying Wright's conviction are not in serious dispute. On the evening of January 14, 1991, Debra Milner was working at the bar of the Hi-Way Inn, a combination bar and liquor store located on Governor Printz Boulevard near Wilmington. Philip Seifert was working in the adjacent liquor store. At around 9:20 p.m., Milner observed a black man in his mid-twenties enter the bar, look around, and leave without making a purchase. At about 10:20 p.m., the liquor store door bell rang, indicating that someone had entered. Seifert went to wait on the customer while Milner answered the telephone.
>
> While she was on the telephone, Milner heard the bell ring again and assumed that the customer had left the liquor store. She

---

[10] *State v. Wright*, 2014 WL 7465795, at *1 (Del. Super. Dec. 16, 2014).

4

then heard the bell ring a third time followed by a noise that she thought sounded like a firecracker. Assuming someone was playing a prank, Milner walked toward the passageway to the liquor store to investigate. Through the passageway, she saw Seifert slumped across the counter. She could not see the customer area of the liquor store from her vantage point. She then heard a gunshot and upon a closer view saw blood around Seifert. Fearing for her safety, Milner ran and hid in a room near the kitchen. Later, she ran back through the bar and out its front door where she saw a customer she recognized, George Hummell, making a telephone call.

Hummell, a machinist inspector employed by Amtrak, was on his way to work and intended to stop at the Hi-Way Inn to cash a check. He was a regular customer and knew both Milner and Seifert. As he was waiting to make a left turn into the parking lot, he saw two men leave the liquor store. Hummell observed one of the men, the shorter of the two, return to the store while the other ran across the parking lot. After a short interval, the man who had re-entered the liquor store came back outside, ran across the road and entered a black Volkswagen in a parking lot across the street. The other man ran down the sidewalk and disappeared into the night. According to Hummell, the man who returned to the store and then left again was black, about 5' 8" tall, while the other man was also black and about 6' tall.

Suspicious of what he had observed, Hummell walked into the bar area, which was empty. He called out the names of several employees of the Hi-Way Inn, but there was no response. Hummell walked out of the bar and into the liquor store. He then saw Seifert with his head on the counter and bleeding from a head wound. Hummell immediately walked to the vestibule and dialed 911.

Sergeant Gary Kresge, the first police officer to arrive at the scene, saw Seifert lying on his back on the floor behind the counter. The cash register drawer was open and approximately $30 had been stolen. Later Seifert was pronounced dead as a result of gunshot wounds. He had been shot three times, once in the neck and twice in the head.

5

Detective Edward Mayfield of the Delaware State Police was assigned to investigate Seifert's murder and robbery. Through an employee of the Hi-Way Inn, which had offered a reward for information leading to an arrest for the crimes, Mayfield received a tip that the perpetrators were "Marlo," an alleged drug dealer who lived on East 28th Street in Wilmington, and another man, "Tee." With the help of Wilmington police, Mayfield learned that "Marlo" was Jermaine Marlo Wright, while "Tee" was the "street name" of Lorinzo Dixon. On the basis of this tip and Hummell's description of the men he saw leaving the scene, Wright was developed as a suspect in the Hi-Way Inn murder/robbery. However, police did not have probable cause to arrest him for those crimes at that time.

In addition to the Hi-Way Inn murder/robbery, Wright was a suspect in two random shootings under investigation by Wilmington police. One shooting, being investigated by Detective Robert Merrill, involved a young boy, Emil Watson, who had been shot in the foot while riding his bicycle. The other, being investigated by Detective Robert Moser, involved the shooting of a young girl in a nearby park. Merrill obtained a warrant to arrest Wright for the Watson shooting and a warrant to search Wright's residence for guns and ammunition.

On January 30, 1991, at approximately 6:00 a.m., the warrants were executed. Because of a belief that Wright was heavily armed, a SWAT team entered and secured the premises and its occupants. Detectives Mayfield, Merrill, and Moser were among those executing the warrants. Wright was arrested for assault and transported to the Wilmington Police Department between 8:00 and 9:00 a.m. He was then processed while the detectives were involved in a number of activities including a SWAT team debriefing, securing evidence that had been seized, interviewing another person who had been arrested at the Wright residence, and attending strategy sessions.

At approximately 12:00 p.m., Wright was first interviewed. After reading Wright the *Miranda* warnings, Detective Merrill questioned him for about 45 minutes regarding the Emil Watson shooting. Detective Moser then entered the room to interview Wright about the park shooting. After again receiving his

*Miranda* warnings, Wright talked with Moser about that shooting for about 45 minutes. The interview then turned to other subjects, with Wright volunteering information regarding other criminal activity about which he had knowledge. Except for a few short breaks, during which Wright was provided with sodas, a sandwich, and opportunities to use the restroom, Moser was alone with Wright from the time the interview started until approximately 7:30 p.m. Detective Mayfield was listening to the conversation in an adjoining room through a speaker system and conferred with Moser during breaks in the questioning.

Most of this six hour discussion focussed on the Hi-Way Inn murder/robbery. Eventually, Wright implicated himself in the crimes. At that point, about 7:00 p.m., Mayfield came to the interview room and told Wright he wanted to take a videotaped statement from him concerning what he had told Moser. Mayfield conducted the videotaped interview from 7:35 to 8:20 p.m., at the beginning of which Wright was again given *Miranda* warnings.

In his statement to police, Wright claimed that on the night of the murder Dixon came to him and told him he knew of a place where someone was working alone. They drove to the Hi-Way Inn in a stolen black Volkswagen Jetta. Seifert refused to cooperate when they demanded money, and Dixon told Wright to shoot Seifert or he (Dixon) would kill Wright. Wright then shot Seifert once in the back of the head and then fled. Following his videotaped statement, Wright was arrested for the Hi-Way Inn killing and taken to Municipal Court where bail was set on the assault charge and then to Justice of the Peace Court No. 11 for presentment on the Hi-Way Inn charges.[11]

At the first pretrial suppression hearing, Detective Merrill testified that he began Wright's interrogation by reciting the *Miranda* rights. He testified he informed Wright:

---

[11] *Wright v. State*, 633 A.2d 329, 331-32 (Del. 1993) (footnotes omitted).

7

> He had the right to remain silent. Anything he said can and would be used against him in a court of law. He had the right to an attorney. If he couldn't afford the attorney, the State would supply an attorney for him. He also had the right to stop answering questions at anytime during the interview.[12]

Detective Merrill's interrogation was not recorded.

Detective Moser of the Wilmington Police Department testified that he began his interrogation by reading the *Miranda* rights from a card. Specifically, he said he advised Wright:

> He had the right to remain silent. Anything he said could and would be used against him in a court of law. He had a right to have an attorney present at any time during questioning. If he could not afford one, the State would provide one for him. If he wished to stop at any time, he could do so. And then I asked him if he understood each and every one of his rights and he stated that he did. I asked him if he wanted to make a statement, and he did.[13]

As mentioned, Wright eventually confessed to shooting Philip Seifert. He agreed to give an audio/videotaped statement describing his involvement in the Hi-Way Inn murder/robbery. Moser's interview with Wright was also not recorded.

Detective Mayfield began the audio/videotaped interview with a recital of the *Miranda* rights, which were not given with the same precision as those given by Merrill and Moser. Mayfield stated the rights as follows:

---

[12] Appellant's Op. Br. App. at A116.
[13] *Id.* at A118.

8

What I'll first do is I'll read your rights to you, okay? Basically, you have the right to remain silent. Anything that you say can and will be used against you in a court of law. You have the right, right now, at any time, to have an attorney present with you, if you so desire. Can't afford to hire one, if the state feels that you're diligent and need one, they'll appoint one for you. You also have the right at any time while we're talking not to answer. Okay? And at the same time, during the interview here, I will advise you, I am a, ah, member of the Delaware State Police. And I am investigating the Highway Inn, the robbery/homicide there. Okay? Do you understand what I have asked you today? Okay. Do you also understand that what we're going to be taking is a formal statement and that this statement's going to be video taped? Okay. Are you willing to give a statement in regards to this incident. Say yes or no.[14]

Each time he was given the *Miranda* rights, Wright agreed to answer the officers' questions.

At trial, the following exchange occurred between defense counsel and Detective Moser:

Defense counsel: Did you give Miranda warnings?
Moser: He had already been Mirandized.
Defense counsel: All right.
Moser: By the other detectives.
Defense counsel: Who Mirandized him?
Moser: I believe Detective Merrill and Detective Burke.[15]

The prosecutor objected to further questions concerning *Miranda* on relevance grounds. At sidebar, the following exchange took place:

---

[14] *Id.* at A92.
[15] *Id.* at A151.

| | |
|---|---|
| Defense Counsel: | Well, your Honor, it may be significant. I mean, we have gone through two suppression hearings. I was certainly under the impression that he be [sic] Mirandized each time. . . . I just want to ask him if he gave him Miranda Warnings. I'm not going to pursue it further. |
| The Court: | You have asked him, he's answered, and so I would suggest that there's no appropriate further questioning. |
| Defense Counsel: | Can I re-emphasize that he did not give him his warnings? |
| The Court: | No.[16] |

Because the questioning on *Miranda* rights was cut off, Detective Moser was not afforded an opportunity to reconcile his trial testimony with his suppression hearing testimony or explain any apparent difference. At no point did Detective Moser deny that he had given the warnings.

In his direct appeal following his convictions, Wright challenged the admission of his statement on the ground that it was obtained following an unreasonable delay between arrest and initial presentment, but did not raise any *Miranda* issues.[17]

Wright's first motion for postconviction relief resulted in the Superior Court ordering a new penalty hearing. After that hearing, Wright was again sentenced to death. On direct appeal, the judgment imposing the death penalty was affirmed. The *Miranda* rights were not an issue in Wright's first motion for postconviction relief.

---

[16] Appellant's Op. Br. App. at A152.
[17] *Wright*, 633 A.2d at 332-33.

Wright filed his second motion for postconviction relief in 1997. In that proceeding, he again argued that his waiver of the *Miranda* rights was not valid because he was intoxicated by heroin at the time.[18] The original trial judge heard Wright's second motion for postconviction relief. In her 1991 pretrial suppression ruling, the original trial judge had agreed that Wright was intoxicated on heroin at the time of his confession, but nonetheless concluded that the confession was voluntary and the waiver of *Miranda* rights was valid.[19] In her opinion denying the second motion for postconviction relief, issued after a hearing and listening to expert testimony offered by Wright, her discussion of the *Miranda* issue included the following:

> At the suppression hearing, the Court specifically considered whether Wright had the capacity to know what he was saying. In so doing, the Court examined the "totality of circumstances including the behavior of the interrogators, the conduct of the defendant, his age, his intellect, his experience, and all other pertinent factors." These other factors included his heroin intoxication at the time of his confession. The Court observed that, while appearing more relaxed and speaking more slowly at his interrogation than he did, for example, at the suppression hearing, Wright's behavior was consistent and coherent throughout the interrogation in which he responded appropriately to the questions put to him. Testimony at the suppression hearing, moreover, disclosed that Wright had been arrested previously and that he was familiar with his *Miranda* right to remain silent. Wright testified that he understood his

---

[18] *Wright*, 1998 WL 734771, at *4.
[19] *State v. Wright*, 1991 WL 11766247, at *7-8 (Del. Super. Oct. 9, 1991).

11

*Miranda* rights on the occasion of the interrogation. There is no evidence from the videotape of Wright's confession that he did not understand what was asked of him or that he did not comprehend the substance of the questions asked, including the nature and importance of the *Miranda* rights, which had been posed three separate times during the interrogation, the last being given immediately before he made his videotaped statement.[20]

Although the original trial judge noted that "[t]he claims regarding waiver of *Miranda* rights . . . were previously adjudicated[,]"[21] she also held that his *Miranda* argument was "substantively without merit because the waiver of his *Miranda* rights was knowing and intelligent."[22] The original trial judge also found that there was no new information that justified overturning the previous ruling on this issue.[23] On appeal, this Court affirmed the Superior Court's judgment.[24]

In 2009, Wright filed his fourth motion for postconviction relief. In that proceeding, the successor judge *sua sponte* called into question whether Wright had been given adequate *Miranda* rights.[25] The successor judge held an evidentiary hearing concerning the adequacy of the *Miranda* rights and Wright's ability to knowingly and voluntarily waive his rights.[26] At the hearing, Detectives Merrill,

---

[20] *Wright*, 1998 WL 734771, at *5 (footnote omitted).

[21] *Id.* at *4.

[22] *Id.* at *6.

[23] *Id.*

[24] *Wright*, 2000 WL 139974, at *1.

[25] *State v. Wright*, 2012 WL 1400932, at *19 (Del. Super. Jan. 3, 2012).

[26] *Id.* at *12.

Moser, and Mayfield were called to testify. As one might expect after almost twenty years, the detectives' testimony was not identical to their previous accounts.[27]

The Superior Court found that Detective Moser never advised Wright of his *Miranda* rights.[28] This finding was based on Detective Moser's 1992 trial testimony and testimony at the 2009 hearing that he thought he obtained a signed waiver. There is no record of a written waiver. However, the finding is contrary to Moser's testimony at the 1991 suppression hearing and his testimony at the hearing in the fourth postconviction proceeding that he did administer the *Miranda* rights.[29] Detective Merrill, by then retired, when asked to recite the warnings at the 2009 hearing, mentioned the right to remain silent, that anything one says can and will be used against him in a court of law, the right to an attorney, and the right to terminate questioning, but omitted the right to appointed counsel. The Superior Court concluded that there was no record of the precise nature of the warnings Detective Merrill gave to Wright, or whether the warnings complied with *Miranda*.

In its opinion granting Wright's fourth motion for postconviction relief, dated January 3, 2012, the Superior Court found that the *Miranda* rights given by Detective

---

[27] For instance, Detective Moser, for the first time, testified that he obtained a signed *Miranda* waiver from Wright. The Superior Court found that Detective Moser's inconsistent testimony and the waiver's absence supported the finding that Detective Moser never read *Miranda* warnings to Wright. *Id.* at *41.

[28] *Id.* at *41.

[29] *Id.*

Mayfield at the beginning of the videotaped statement were inherently confusing and did not adequately explain to Wright that he was entitled to have counsel appointed for him. Specifically, the court stated:

> [A]s the court first raised *sua sponte*, the *Miranda* warnings given to Wright prior to his only recorded interrogation not only failed to adequately convey to Defendant his right to counsel, but may have misled him into believing he had a right to appointed counsel only if the state felt he needed one. Because the warnings given to Wright were so defective, his statement to the police should have been excluded from evidence. [Next], the court finds that Defendant did not knowingly and intelligently waive his *Miranda* rights. Therefore, the resulting statement should have been excluded from evidence.[30]

The Superior Court also found that the State violated *Brady* by not disclosing that an attempted robbery had occurred at Brandywine Village Liquors, only a mile and a half away from the Hi-Way Inn, approximately 30 to 40 minutes before the Hi-Way Inn murder/robbery. The police determined that Wright was not involved in the attempted robbery at Brandywine Village Liquors but failed to disclose this information to Wright. As a result of these rulings, the Superior Court vacated Wright's convictions. The State appealed.

This Court reversed the judgment of the Superior Court, holding that the Superior Court erred in reviewing the admissibility of the statement and in finding that

---

[30] *Id.* at *5.

14

there was a *Brady* violation.[31]  With regard to the statement, the Court ruled that reconsideration of its admissibility was barred by Superior Court Rule 61(i)(4). Specifically, the Court stated as follows:

> The Superior Court decided to address the adequacy of Wright's *Miranda* warnings *sua sponte*.  It listened to the same videotaped confession that was the subject of a motion to suppress before trial; a claim of error on direct appeal; the second Rule 61 motion; and the appeal of that motion.  Each challenge was rejected after addressing Wright's understanding of his *Miranda* rights.  In deciding Wright's fourth postconviction motion, the Superior Court did not have any new evidence upon which to conclude that Wright's *Miranda* warnings were defective.  "[A] defendant is not entitled to have a court re-examine an issue that has been previously resolved 'simply because the claim is refined or restated.'"  Wright did not ask for that relief, but if he had, there would be no basis on which to find that he overcame the procedural bar of Rule 61(i)(4).  Reconsideration is not warranted in the interest of justice.[32]

The Court remanded the case to the Superior Court with instructions to reinstate Wright's convictions.[33]

After the Superior Court reinstated Wright's convictions, he appealed certain claims which had been denied by the Superior Court in the fourth postconviction proceeding.  He argued that the State suppressed additional *Brady* material.  This evidence included impeachment evidence related to Gerald Samuels, a prison informant who testified that Wright confessed to the murder, and exculpatory and

---

[31] *State v. Wright*, 67 A.3d 319, 321 (Del. 2013).
[32]  *Id.* at 323-24 (quoting *Skinner v. State*, 607 A.2d 1170, 1172 (Del. 1992)).
[33] *Wright*, 67 A.3d at 325.

impeachment evidence related to Kevin Jamison, a witness that Wright contended committed the murder.

This Court concluded that the cumulative effect of multiple *Brady* violations required reversal and remand for a new trial.[34] This Court did not address any *Miranda* issues in that decision, which is the most recent from this Court.

After the case was remanded for a new trial, the Superior Court issued a letter creating a pretrial agenda for the new trial. One of the items listed was whether Wright could move to suppress his statement, and, if so, whether such a motion should be granted.[35] In turn, Wright filed a motion to suppress his confession arguing that the *Miranda* rights the police gave him were inadequate.[36] The State opposed Wright's motion and argued that the Superior Court was barred from considering this issue by the law of the case doctrine.[37]

In January 2015, the Superior Court granted Wright's motion to suppress.[38] In doing so, the court held that the law of the case doctrine did not bar consideration of the adequacy of the *Miranda* rights for two reasons: (1) the specific legal issue raised was never definitively decided; and (2) "new" facts and inconsistencies were

---

[34] *Wright v. State*, 91 A.3d 972, 994 (Del. 2014).
[35] Appellant's Op. Br. App. at A166-67.
[36] *State v. Wright*, 2015 WL 475847, at *1 (Del. Super. Feb. 2, 2015).
[37] *Id.*
[38] *Id.* at *29.

16

developed through the detectives' testimony, and these developments formed the basis of an exception to the law of the case doctrine. This appeal followed.[39]

## II.  DISCUSSION

### A.  *The Admissibility of Wright's Confession is Controlled by the Law of the Case Doctrine*

This Court reviews the Superior Court's decision to grant or deny a motion to suppress for abuse of discretion.[40]  An abuse of discretion occurs when the trial judge "exceed[s] the bounds of reason in view of the circumstances and has so ignored recognized rules of law or practice so as to produce injustice."[41]  The formulation and application of legal principles is reviewed *de novo*.[42]

The State contends that the law of the case doctrine bars review of the adequacy of the *Miranda* rights in the new trial proceedings.  Wright contends that the Superior Court is not barred by the law of the case doctrine because no court has evaluated or ruled on the adequacy of the *Miranda* rights, that there are exceptions to the law of the case doctrine which apply here, and that the *Miranda* rights given were inadequate. He concedes that related issues were litigated, but argues that the law of the case

---

[39] *See* 10 *Del. C.* § 9902(c) ("The State shall have an absolute right of appeal to an appellate court from an order entered pursuant to subsection (b) of this section and if the appellate court upon review of the order suppressing evidence shall reverse the dismissal, the defendant may be subjected to trial.").

[40] *Lopez-Vazquez v. State*, 956 A.2d 1280, 1284 (Del. 2008).

[41] *Charbonneau v. State*, 904 A.2d 295, 304 (Del. 2006).

[42] *Cede & Co. v. Technicolor, Inc.*, 884 A.2d 26, 36 (Del. 2005).

17

doctrine does not apply because the adequacy of the warnings was never specifically argued or decided.

The law of the case doctrine is a self-imposed restriction that prohibits courts from revisiting issues previously decided, with the intent to promote "efficiency, finality, stability and respect for the judicial system."[43] "The law of the case is established when a specific legal principle is applied to an issue presented by facts which remain constant throughout the subsequent course of the same litigation."[44] The doctrine is not an absolute restriction, and it allows the Superior Court and this Court to reexamine issues that are "clearly wrong, produce[] an injustice or should be revisited because of changed circumstances."[45]

"The law of the case doctrine presumes a hearing on the merits"[46] and "only applies to issues the court actually decided."[47] Courts usually require the issue to have

---

[43] *Cede & Co.*, 884 A.2d at 39; *accord Ins. Corp. of Am. v. Barker*, 628 A.2d 38, 41 (Del. 1993); *United States v. Arce-Jasso*, 389 F.3d 124, 131 (5th Cir. 2004); *United States v. Tamayo*, 80 F.3d 1514, 1520 (11th Cir. 1996); *Bankers Trust Co. v. Bethlehem Steel Corp.*, 761 F.2d 943, 949-50 (3d Cir. 1985).

[44] *Hoskins v. State*, 102 A.3d 724, 729 (Del. 2014) (quoting *Kenton v. Kenton,* 571 A.2d 778, 784 (Del. 1990)); *see also Nationwide Emerging Managers, LLC v. Northpointe Holdings, LLC*, 112 A.3d 878, 894-95 (Del. 2015) ("Under the 'law of the case doctrine,' a court's legal ruling at an earlier stage of proceedings controls later stages of those proceedings, provided the facts underlying the ruling do not change.").

[45] *Hoskins*, 102 A.3d at 729 (quoting *Gannett Co. v. Kanaga*, 750 A.2d 1174, 1181 (Del. 2000)); *see also Hamilton v. State*, 831 A.2d 881, 887 (Del. 2003) ("The law of the case doctrine does not preclude this Court or the Superior Court from reexamining [] prior rulings . . . when the factual premises of those [] rulings are demonstrated to have been mistaken.").

[46] *United States v. Hatter*, 532 U.S. 557, 566 (2001).

[47] *John B. v. Emkes*, 710 F.3d 394, 403 (6th Cir. 2013).

been "fully briefed and squarely decided" in the prior proceedings.[48] But "[t]he decision of an issue need not be express to establish the law of the case."[49] Issues decided implicitly, "or by necessary inference from the disposition" satisfy the actual decision requirement.[50] Thus a trial court, on remand, is not free to decide issues that have been "expressly or implicitly disposed of [by the appellate court]."[51]

It is also established that a trial court's previous decision in a case will form the law of the case for the issue decided.[52] In *Nationwide Emerging Managers, LLC v. Northpointe Holdings, LLC*, a Superior Court judge dismissed a plaintiff's claim that was based on a specific contractual provision.[53] Subsequently, the judge retired and the case was assigned to his successor.[54] The plaintiff renewed the claim.[55] The successor judge rejected the defendant's contention that the law of the case doctrine barred reconsideration of the dismissal, reinstated the claim, and found that the defendant breached the contractual provision.[56] This Court reversed, reasoning that

---

[48] *Hanover Ins. Co. v. Am. Eng'g Co.*, 105 F.3d 306, 312 (6th Cir. 1997).

[49] 18B CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 4478, at 657-58 (2d ed. 2015) ("Implicit decision suffices, and a terse decision is even more clearly the law of the case because it does not require a determination whether the actual decision can be inferred.").

[50] *Hanover Ins.*, 105 F.3d at 312 (quoting *Coal Res., Inc. v. Gulf & W. Ind.*, 865 F.2d 761, 766 (6th Cir. 1989)).

[51] *Cede & Co.*, 884 A.2d at 38.

[52] *Nationwide Emerging Managers*, 112 A.3d at 894-95; *Bailey v. State*, 521 A.2d 1069, 1093 (Del. 1987); *Hughes v. State*, 490 A.2d 1034, 1048 (Del. 1985); *Haveg Corp. v. Guyer*, 211 A.2d 910, 912 (Del. 1965).

[53] *Nationwide Emerging Managers*, 112 A.3d at 894.

[54] *Id.*

[55] *Id.*

[56] *Id.*

under the doctrine of law of the case, the Superior Court's legal ruling at an earlier stage of the proceedings controls later stages of those proceedings, provided the facts underlying the ruling do not change.[57]  In that case, this Court found that the factual basis of the Superior Court's first ruling had not changed.[58]  This Court further held that reconsideration was unwarranted because "there was no error or injustice, much less a clear one, stemming from the first ruling that would justify reconsideration."[59]

In this case, the original trial judge's 1991 pretrial ruling, not challenged on appeal, that Wright knowingly, voluntarily and intelligently waived his *Miranda* rights established the law of the case on that issue.  An implied finding that the rights were adequately administered is essential to a finding that *Miranda* rights have been knowingly, voluntarily and intelligently waived.  The 1991 ruling necessarily includes an implied finding that the rights were adequately explained.  Therefore, the original trial judge's 1991 ruling is the law of the case on the adequacy of the *Miranda* rights, unless an exception to the law of the case doctrine applies.  The original trial judge's 1992 finding that *Miranda* rights were given and waived three times; her ruling in Wright's second postconviction proceeding that he knowingly and intelligently waived the *Miranda* rights; and this Court's finding in our first opinion in Wright's fourth postconviction proceeding that litigation of the adequacy of the warnings was

---

[57] *Id.* at 895.

[58] *Id.*

[59] *Nationwide Emerging Managers*, 112 A.3d at 895.

20

barred by Superior Court Criminal Rule 61(i)(4), serve to strengthen the conclusion that the original judge's 1991 ruling that Wright's statement is admissible is the law of the case.[60]

As mentioned above, the doctrine of law of the case does not bar "reconsideration of a prior decision that is clearly wrong, produces an injustice or should be revisited because of changed circumstances."[61] But none of these exceptions applies here.

It cannot be said that the Superior Court's 1991 opinion denying Wright's *Miranda* challenge was clearly wrong. Wright admitted his involvement in Seifert's murder to Detective Moser. The record of the 1991 suppression hearing shows that Moser correctly explained the *Miranda* rights and that Wright waived them. Detective Mayfield became involved to audio/videotape the statement, which Wright had just given to Moser. It is argued that Detective Mayfield was required to re-administer the *Miranda* rights, and do so correctly. However, it cannot be said that the 1991 opinion is clearly wrong.

Although the argument in favor of the manifest injustice exception may have some merit, it is not persuasive. Wright argues that he should receive the benefit of

---

[60] Super. Ct. Crim. R. 61(i)(4) ("Any ground for relief that was formerly adjudicated, whether in the proceedings leading to the judgment of conviction, in an appeal, in a postconviction proceeding, or in a federal habeas corpus proceeding, is thereafter barred.").

[61] *Hoskins*, 102 A.3d at 729.

the exception because the State seeks to sentence him to death. And his argument does have some support.[62] But Wright has already had multiple opportunities to challenge the admissibility of his statement. While it is true that he has not explicitly challenged the adequacy of his *Miranda* rights until his most recent motion for postconviction relief, the facts that would be properly evaluated in such a challenge, as described below, are the same facts considered by the original judge when she denied his motion to suppress in 1991 and his second motion for postconviction relief. It is not manifest injustice to deny Wright an opportunity to set the same facts before a different judge with the hope that he will receive a different ruling.

With regard to changed circumstances, testimony from the same witnesses eighteen years after they first took the stand is not the sort of new evidence or changed circumstances that forms the basis of an exception to the law of the case doctrine.[63] This remains true even if inconsistencies are developed as a result.[64] Memories

---

[62] *See* WRIGHT ET AL., *supra* note 49, § 4478, at 686-87 (suggesting that death penalty cases are "special" and courts may be more willing to lower the bar); *see also Dobbs v. Zant*, 506 U.S. 357, 358-60 (1993) ("We have emphasized before the importance of reviewing capital sentences on a complete record. . . . [R]efusal to review the transcript [which was previously unavailable] left [the court of appeals] unable to apply the manifest injustice exception to the law of the case doctrine, and hence unable to determine whether its prior decision should be reconsidered.").

[63] *See* WRIGHT ET AL., *supra* note 49, at 683-84 (discussing the "high threshold" set by many courts when considering new evidence as an exception and the reluctance to consider evidence available during earlier proceedings as sufficient to form the basis of this exception).

[64] Inconsistencies, within a certain degree, should be expected when such a length of time has passed, and inconsistencies will not be sufficient to form the basis of an exception unless they significantly undermine the foundation of the prior decisions. *See id.* at 680-82. But, that determination generally lies within the trial judge's discretion. *Id.*

understandably fade over time, and testimony from the same witnesses elicited years or decades after the original decision is of questionable value.[65]  If such testimony were sufficient to sidestep the doctrine's restrictions, the goals of efficiency, finality, and stability would be defeated because such "new" evidence potentially exists in every case.[66]

This does not mean that evidence sufficient to satisfy the doctrine's exception cannot come from the same witnesses that testified many years prior.  For example, the doctrine may not prevent the court from reconsidering legal issues when a material witness recants prior testimony.[67]  In such a situation, previously unavailable evidence transforms the factual basis of the prior legal determinations.[68]  But evidence from

---

[65] The Superior Court also recognized the effects of time on a person's memory when it commented on Detective Moser's memory in its 2012 decision:

> The court's findings are not an attack on Detective Moser's credibility.  To the contrary, the court believes he was honest in his efforts to recall the events of March 14, 1991.  *It is no criticism of him that time may have eroded his memory of those long-ago events.*

*Wright*, 2012 WL 1400932, at *41 n.132 (emphasis added); *see also Pierson v. State*, 338 A.2d 571, 574 (Del. 1975) (quotation omitted) (discussing the danger of relying on faded and often confused memories in the context of written affidavits in support of search warrants).

[66] *See* WRIGHT ET AL, *supra* note 49, at 680-81 ("The needs for stability and procedural efficiency, however, counsel that a persuasive justification should be required to support consideration of [] new evidence."); *see also id.* at 683-84 n.70 (observing that courts generally do not find testimony developed at new hearings as sufficient to satisfy the new evidence exception); *Cede & Co.*, 884 A.2d at 40-41 ("The only circumstance that has changed since 1991 was the remand for a new trial.  This was not a basis to change matters already decided and not appealed.  Because there was no available exception to the law of the case doctrine, these findings on the discount rate and corporate debt of Technicolor were binding upon the Court of Chancery.").

[67] *Weedon v. State*, 750 A.2d 521, 528-29 (Del. 2000).

[68] *Id.*

23

faded memories eighteen years after an event does not constitute changed circumstances. All of the facts and circumstances relevant to the adequacy of the *Miranda* rights were known when the Superior Court rendered its decision in 1991. There are no changed circumstances.

None of the exceptions to the law of the case doctrine applies. For all these reasons, the Superior Court erred in determining that the law of the case doctrine did not apply and in suppressing the statement. Based on the law of the case, Wright's *Miranda* rights were adequately explained and waived, and therefore, his statement is admissible.[69]

### B. *The President Judge of the Superior Court Shall Assign the Matter to a Different Judge*

As mentioned, we do not consider the Superior Court's denial of the State's motion for recusal, or express any opinion thereon. However, the trial judge in this case may be called upon to make potentially case dispositive rulings. The judge currently assigned to the case has stated on the record that he has virtually no confidence in the State's evidence. Because of this and other comments of record, we have concluded that "the public's confidence in the impartial administration of justice

---

[69] The State conceded at oral argument that Wright can still argue the voluntariness of his statement to the jury, as he did in his first trial.

would be enhanced if"[70] a new judge presided over Wright's case on remand.[71] The

President Judge is directed to assign the case to another judge.

### III.  CONCLUSION

For the reasons set forth above, Wright's statement to the police is admissible

at trial.  We reverse the order of the Superior Court dismissing the indictment under

10 *Del. C.* § 9902(b) and remand the matter for further proceedings consistent with

this opinion.  Jurisdiction is not retained.

---

[70] *Flonnory v. State*, 778 A.2d 1044, 1057 (Del. 2001).
[71] *See In re One Minor Child*, 411 A.2d 951, 953 (Del. 1980) ("Since the judge who sat below expressed an opinion that there was '(in)sufficient likelihood that the father could prevail on the merits of the petition to terminate his parental rights to warrant a reopening of this matter', the rehearing should be assigned to another judge.").