IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| MARISA CATHELL, | § | |
| | § | No. 353, 2019 |
| Defendant Below, | § | |
| Appellant, | § | |
| | § | |
| v. | § | Court Below: Superior Court |
| | § | of the State of Delaware |
| STATE OF DELAWARE, | § | |
| | § | Cr. ID No. 1807020675(N) |
| Plaintiff Below, | § | |
| Appellee. | § | |

Submitted: February 19, 2020
Decided: March 9, 2020
Corrected:  March 10, 2020

Before, **SEITZ**, Chief Justice; **VALIHURA**, and **MONTGOMERY-REEVES** Justices.

# **O R D E R**

This 10th day of March, 2020, upon consideration of the parties' briefs and the record below, it appears to the Court that:

(1)  The appellant, Marisa Cathell,[1] appeals her Superior Court criminal conviction for Second-Degree Assault of a minor.  A jury convicted Cathell, after a four-day trial in March of 2019, of physically abusing a four-year-old child in July

---

[1] The Opening Brief identifies the appellant as "Marissa Cathell," but the Notice of Appeal, Superior Court materials, and Answering Brief all refer to her as "Marisa Cathell."  We adopt the Superior Court's spelling.

of 2018.[2] On August 8, 2019, Cathell filed a timely notice of appeal contesting the conviction. This Court, having reviewed the record and the briefs from both parties, concludes that neither of Cathell's arguments are meritorious and affirms the judgment of the Superior Court.

(2) During the summer of 2018, Stefano Siaenni attempted to reestablish a relationship with his four-year-old daughter.[3] The child lived with her grandmother, Valerie Miller, who had been the child's guardian since she was an infant.[4] On July 21, 2018, Siaenni picked up the child from Miller's home for an overnight stay.[5] Marisa Cathell, Siaenni's girlfriend, also stayed with him that weekend.[6] At the time, the child was not potty trained; Siaenni expressed concern about this and planned to potty train her during the overnight stay.[7] That night, Siaenni placed the child on the toilet for about an hour in an attempt to have her use the bathroom.[8]

(3) Around four o'clock the following day, Siaenni and Cathell drove the child back to Miller's house, but Miller was not home.[9] Siaenni then drove to the

---

[2] App. to Opening Br. i-iv ("A__" hereafter).
[3] Siaenni spent approximately four years in federal prison for drug related charges. A423, 427.
[4] A138-39.
[5] A143
[6] A444.
[7] A445.
[8] A446.
[9] A452.

Wawa to "figure things out, recuperate."[10]  Cathell took the child into the bathroom in Wawa for approximately thirty to forty minutes.[11]  During their time in the bathroom, a Wawa employee, Johan Holley, went to change the soap in the women's bathroom.[12]  Holley did not enter the bathroom because it was occupied.  He did however hear what he believed to be a woman disciplining a child.[13]

(4)  Holley testified that he believed the woman was spanking the child based on the sounds he heard.  He stated that he also heard a woman's voice and a child crying.[14]  Holley testified that a second round of "beatings" started soon after the first, with a woman yelling "[y]ou're not the boss, you're going to listen to me."[15]  Holley informed a female manager that something was occurring in the women's bathroom and someone needed to go inside to check it out.[16]  The manager entered the bathroom and asked if everything was ok, to which Cathell responded "yes everything is fine."[17]  Shortly after the manager left, Holley testified that a third round of beatings occurred, with the woman claiming that she was going to leave the child behind.[18]

---

[10] A453.
[11] A457.
[12] A310.
[13] *Id.*
[14] A312.
[15] A314.
[16] A317.
[17] A318.
[18] A321.

3

(5)   While this was going on, Siaenni remained outside with the car, talking to his father on the phone.[19]   After approximately thirty minutes, Siaenni called Cathell to see how long they would be, and Cathell responded they were about to come out. [20]   Siaenni testified that Cathell seemed agitated on the phone and stated that the child was being stubborn.[21]   After another ten minutes, Siaenni went inside and knocked on the bathroom door.[22]   When Cathell and the child exited the bathroom, Siaenni stated that they looked normal.[23]

(6)   When they pulled out of the Wawa, Cathell stated that she noticed the child "scratching . . . in her lower area."[24]   Cathell checked the child and drew attention to an area that Siaenni believed was a rash.[25]   At the urging of Cathell, the child told Siaenni that "[Jamie] put their finger up her vagina . . . and told her not to tell anybody."[26]   When Siaenni arrived back at Miller's house he asked Miller about the rash and anyone named Jamie.[27]   Neither Siaenni, Cathell, nor Miller knew who

---

[19] A457.
[20] A457-58.
[21] A458-59.
[22] *Id.*
[23] A466.
[24] A480.
[25] A482.
[26] A470.
[27] A486.

4

Jamie was; however, the child stated that Jamie was a friend of Eric, a man Miller had dated previously.[28]

(7) After Siaenni and Cathell left, Miller examined the child, found bruising, and took the child to the hospital where she was examined by a forensic nurse.[29] The child then went to the Children's Advocacy Center at A.I. duPont Hospital for Children, where the child met with a forensic interviewer.[30] During the taped forensic interview, the child disclosed that Cathell had hurt her.[31] Dr. Alan DeJong, a child abuse expert, also examined the child's file.[32] Dr. DeJong concluded that the child's injuries were not the result of an accident but were intentionally inflicted.[33] Thereafter, the State charged Cathell with Second-Degree Assault for injuring the child, and a jury convicted Cathell of the same.[34]

(8) On appeal, Cathell argues that the Superior Court abused its discretion by (a) refusing to allow the defense to question Valerie Miller about previous investigations of Miller by Delaware Family Services and (b) allowing the child to testify.[35] Limitations on the examination of witnesses and determinations of witness

---

[28] A457.
[29] A154, 175-76, 358, 363, 457.
[30] A88, 98.
[31] Answering Br. 6.
[32] A232-38.
[33] A285-86.
[34] Ai-iv.
[35] Opening Br. 3.

competency are reviewed by this Court for abuse of discretion.[36]  An abuse of discretion occurs when a trial judge "exceeds the bounds of reason in view of the circumstances and has so ignored recognized rules of law or practice so as to produce injustice."[37]  Here, neither of Cathell's arguments support a finding of abuse of discretion.

(9) Cathell argues that the Superior Court abused its discretion by prohibiting the defense from cross-examining Miller about previous Delaware Family Services ("DFS") investigations occurring in 2009 and 2011.[38]  The record is unclear as to the nature of the 2009 allegation, but the State represented that the allegation was unsubstantiated.[39]  The 2011 investigation followed an accusation of neglect.[40]  DFS investigated but did not substantiate the claim.[41]  The Superior Court denied Cathell the opportunity to question Miller about these two investigations, ruling that they were irrelevant.[42]

---

[36] *Jones v. State*, 940 A.2d 1, 15 (Del. 2007) (citing *Johnson v. State*, 878 A.2d 422, 425 (Del. 2005); *Hardin v. State*, 844 A.2d 982, 987 (Del. 2004); *Williamson v. State*, 707 A.2d 350, 359 (Del. 1998)); *Ricketts v. State*, 488 A.2d 856, 857 (Del. 1985) (citing *Thompson v. State*, 399 A.2d 194, 198-99 (Del. 1979)).

[37] *State v. Wright*, 131 A.3d 310, 320 (Del. 2016) (quoting *Charbonneau v. State*, 904 A.2d 295, 304 (Del. 2006)).

[38] Opening Br. at 10.

[39] Answering Br. 9; A213.

[40] A209-13.

[41] *Id.*

[42] A216-17.

(10) Delaware Rule of Evidence 401 states that evidence is relevant if "(a) it has a tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."[43] Furthermore, Rule 402 states "[i]rrelevant evidence is not admissible."[44] Here, Cathell argues that the investigations were relevant and sought to introduce them to show that Miller had a reason to "lie and/or put the blame on [Cathell] as she did not want the focus to be on her" and that Miller was biased against Cathell.[45] Cathell's arguments fail.

(11) First, the prior investigations into Miller occurred at least seven years before this incident, were unsubstantiated, did not involve any allegations of physical abuse, and did not involve the same child. They have long been resolved, and Miller faces no threat of reprisal from those allegations. Further, introducing the years-old unsubstantiated neglect allegations would not make it more probable that Miller overreacted and "initiate[d] the investigation" into Cathell.[46] Moreover, Miller's history with DFS has no bearing on the contested issue of whether the alleged abuse occurred. As the Superior Court noted, Miller was "not a witness to what happened," and her interactions with DFS would not make it more or less likely

---

[43] D.R.E. 401.
[44] D.R.E. 402.
[45] Opening Br. at 11; A213.
[46] A213-15.

that Cathell abused the child in the Wawa restroom.[47] Thus, the Superior Court did not abuse its discretion in holding that the investigations were irrelevant to whether Cathell abused the child.[48]

(12) Second, further questioning of Miller was unnecessary to prove bias, which was already clear at trial. Miller was openly hostile toward Cathell in her testimony and during cross-examination. As the Superior Court put it:

> [I]t . . . could not be more clear that this witness has not just animosity to the defendant. But [Miller's] demeanor on the stand revealed her also to be someone who arguably overreacted to the situation and is very hostile to the defendant. And I don't think there's any question that from the beginning of this her motivation was to focus the investigation on [Cathell]. . . . So I am not in any way convinced that . . . it's necessary to prove this unsubstantiated, unrelated investigation in to demonstrate that motive.[49]

The Superior Court held that Miller clearly demonstrated her ire towards Cathell. Under these circumstances, the Superior Court did not abuse its discretion in excluding this evidence as irrelevant.

(13) Cathell next argues that the child was not a competent witness and the Superior Court abused its discretion by letting her testify at trial. Cathell claims that the child's testimony was "very sparse" on details of the abuse and included

---

[47] *Id.*
[48] A116-17.
[49] A216.

8

inconsistent statements.  Because of this, Cathell contends that the court failed to maintain a minimum standard for witness competency.[50]

(14)  Delaware Rule of Evidence 601 states that "[e]very person is competent to be a witness unless these rules provide otherwise."[51]  In *Ricketts v. State*, this Court noted that Rule 601 closely mirrors Federal Rule of Evidence 601 and found the Advisory Committee's Note on Federal Rule 601 helpful in interpreting the Delaware rule.[52]  The note states in part that "[d]iscretion is regularly exercised in favor of allowing testimony.  A witness wholly without capacity is difficult to imagine.  The question is one particularly suited to the jury as one of weight and credibility, subject to judicial authority to review the sufficiency of the evidence."[53] A child is presumed competent to testify once the trial judge is satisfied by *voir dire* that the child understood her obligation to tell the truth and the difference between truth and falsehood.[54]

(15)  Here, the Superior Court conducted an extensive *voir dire* with the child before allowing her to testify to determine her understanding of the truth and lies:

> **Q**.  And so if I say to you – what color is my hair?
> **A**.  Black.

---

[50] Opening Br. at 15, 17.

[51] *Ricketts*, 488 A.2d at 857 n.1 ("The only rules that specifically preclude a witness from testifying are those that prevent a presiding judge or jury member from testifying at a trial on which they are sitting.  D.R.E. 605, 606.").

[52] 488 A.2d at 857.

[53] Fed. R. Evid. 601.

[54] *Ricketts*, 488 A.2d at 857.

> **Q.** And if I say to you no, I have purple hair, would that be the truth or a lie?
> **A.** A lie.
> **Q.** Ok. And if I say to you, you have very pretty brown hair, would that be the truth or a lie?
> **A.** The truth.
> **Q.** The truth. Okay. And if I say to you there's a dinosaur sitting in that chair over there, would that be the truth or a lie?
> **A.** A lie because there's no dinosaur.
> \* \* \*
> **Q.** So which is better telling the truth or telling a lie?
> **A.** The truth.
> \* \* \*
> **Q.** So is it good to tell the truth or bad to tell the truth?
> **A.** It's good to tell the truth.
> **Q.** Is it bad to tell a lie or good to tell a lie?
> **A.** It's a bad thing to tell a lie.[55]

Based on this colloquy, the court found that the child understood the difference between the truth and a lie; she understood that she needed to tell the truth; and she promised that she would tell the truth.[56] After reviewing the Superior Court's *voir dire* with the child, it is clear that the court did not abuse its discretion under Rule 601 by allowing the child to testify and allowing the jury to determine the weight and credibility it would place on the testimony.

(16) As Cathell failed to show any abuse of discretion by the Superior Court when it denied examination of Miller concerning prior DFS investigations or when it permitted the child to testify, Cathell's appeal fails.

---

[55] A71-72.
[56] A86-87.

NOW, THEREFORE, IT IS ORDERED that the judgment of the Superior

Court is AFFIRMED.

BY THE COURT:

_/s/ Tamika R. Montgomery-Reeves_
Justice